1
2
3
4
5

# UNITED STATES DISTRICT COURT

6

## DISTRICT OF ARIZONA

7

| | |
|---|---|
| Estevan Luis Duran Montez, | CV 10-0544-TUC-FRZ (JR) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| vs. | |
| Michael J. Astrue, Commissioner of the Social Security Administration, | |
| Defendant. | |

8
9
10
11
12
13
14
15

    Plaintiff Estevan Luis Duran Montez brought this action pursuant to 42 U.S.C.

16 § 405(g) seeking judicial review of a final decision by the Commissioner of Social

17 Security denying his claim for disability insurance benefits (DIB) under Title II of

18 the Social Security Act, 42 U.S.C. §§ 401-433. Plaintiff presents two issues on

19 appeal: whether the Administrative Law Judge (ALJ) failed to accord the appropriate

20 weight to treating physician testimony; and whether the ALJ improperly evaluated

21 Plaintiff's pain testimony. Pending before the court is an Opening Brief filed by

22 Plaintiff (Doc. 19), the Commissioner's Opposition (Doc. 20), and Plaintiff's Reply

Brief (Doc. 21).  Based on the pleadings and the administrative record submitted to the Court, the Magistrate Judge recommends that the District Court, after its independent review, remand this case for further proceedings.

## I.  PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits in July 2007, alleging disability since October 16, 2006, due to injuries he sustained in a motorcycle accident on that date.  (Administrative Record (AR) 35, 131-35, 676-81.) The Social Security Administration denied Plaintiff's application for DIB initially and upon reconsideration.  (AR 67-69, 72-75, 77-79.)  Plaintiff requested a hearing before an ALJ. (AR 80-81.)  On July 22, 2009, he appeared with counsel and testified before an ALJ.  (AR 28-66.)  In a decision issued on November 10, 2009, the ALJ concluded that Plaintiff was not disabled within the meaning of the SSA.  (AR 12-27.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision.  (AR 1-4.)  This appeal followed.

## II.  FACTUAL HISTORY

### A.  Plaintiff's Background

Plaintiff was born on May 26, 1954, making him 52 years-old at the alleged onset of his disability and 55 at the time of the hearing.  (AR 33, 148.)  He has a high school education and some college.  (AR 33.)  He worked for 18 years as a surgical/patient technician at a hospital.  (AR 33, 153-54.)

2

## B.	Medical Records

On October 16, 2006, Plaintiff was in a motorcycle accident and sustained a dislocated left thumb, a neck strain, back pain and aggravation of pre-existing right shoulder pain.  (AR 152, 232-36.)   On referral from his treating physician, Christopher Wintzer, M.D., Plaintiff began seeing Arlo Brakel, M.D., a neurosurgeon, for his musculoskeletal complaints and, in October, Plaintiff began seeing Joseph Sheppard, M.D., for his thumb injury.  (AR 627-650

Plaintiff's first visit to Dr. Brakel was on December 28, 2006.  (AR 271-74.) The doctor found Plaintiff had a reduced range of motion of this neck and right shoulder, blunted right triceps reflexes, and signs of possible cervical radiculopathy. Plaintiff also had a reduced range of motion of his low back, positive straight leg raise testing (a sign of radiculopathy), blunted ankle jerks, and a painful gait.  (*Id.*) After examination, Dr. Brakel's impression included a cervical sprain with suspicion of root compression, suspicion of a mid-thoracic compression fracture, lumbar sprain, right brachial plexopathy, rib contusions and dislocation of the left thumb requiring reduction and casting.  (AR 274.)  Dr. Brakel indicated that Plaintiff was disabled from his employment due to the thumb dislocation and due to "ongoing spinal disorders that have not been accurately identified or diagnosed."  He recommended MRI studies of the cervical and thoracic spine and CT scanning of the lumbar spine.  (*Id.*)

In January 2007, Plaintiff saw Dr. Sheppard about his thumb and the Plaintiff reported improved motion and function but continued strength deficit.  (AR 645.)  In

April, Dr. Sheppard noted that Plaintiff's left thumb had intermittent symptoms of instability and "mild" subluxation, but preserved mobility and intact sensation. (AR. 644.)

On January 25, 2007, the MRI and CT studies recommended by Dr. Brakel were performed. (AR 276-78.) The lumbar CT scan revealed left foraminal narrowing with impingement of the exiting left L5 nerve root and "a shallow broad based posterior disc bulge" at the same level. (AR 276.) The MRI of the cervical spine revealed foraminal narrowing and disc osteophyte complex at C5-6 and C6-7 with thinning of the cerebral spinal fluid space. (AR 278.) On February 21, 2007, Dr. Brakel reviewed the studies with the Plaintiff and noted that he continued to experience neck pain and low back pain, radiating from the right buttock down the thigh, but without weakness. (AR 268.)

As for the studies, Dr. Brakel noted that they were "very illuminating." He reported that the cervical spine imaging showed "advanced degenerative disc disease at C5-6 and C6-7 with annular end plate spurring and uncovertebral joint hypertrophy resulting in a degree of cross sectional and foraminal stenosis." (AR 268.) Dr. Brakel interpreted the lumbar imaging as showing a bilateral "potential for L5 root impingement in its neural exit foramen at L5-S1 where there is significant facet arthropathy encroaching upon the neural exit." He noted the disc protrusion at L3-4 and L4-5 and stenosis of the cross sectional area of the canal. (*Id*.) On examination, Dr. Brakel noted a moderately decreased range of motion in the neck with signs of radiculopathy, blunted triceps and biceps reflexes, and some reduced

4

strength due to pain. (AR 269.) He recommended continued conservative therapies, such as aqua therapy and cervical traction, but provided an epidural steroid injection for the lumbar anomaly. Dr. Brakel scheduled him for another visit in March "before a determination for ability to return to work is made." (AR 269-70.)

In March 2007, Dr. Brakel completed a form in connection with Plaintiff's claim for long-term disability benefits. (AR 259-261.) He stated that Plaintiff had been placed "off work" since his motorcycle accident on October 16, 2006, and that he remained totally disabled from his occupation as a patient care technician. (AR 260.) The doctor found that Plaintiff could lift/carry 10 pounds and push/pull 20 pounds; sit 20 minutes at a time for 6 hours total, stand 5 minutes at a time for 2 hours total, and walk 10 minutes at a time for 2 hours total. He indicated Plaintiff should not bend, stoop, crouch, crawl, or kneel, and that he should do "minimal" overhead reaching. He noted no limitations on fine fingering or gross handling activities. (AR 260-61.)

Later that month, in an office record dated March 29, 2007, Dr. Brakel reported that when the Plaintiff turned his head to the right, there is radiation down the right arm, and that his low back pain occasionally radiated down his right leg. (AR 266.) The Plaintiff had a diffusely reduced range of motion in the neck, shoulder and lumbar spine. (*Id*.) The doctor reiterated the Plaintiff's spinal abnormalities, and noted that there was some delay in obtaining approval for aqua therapy and a steroid injection. The Plaintiff was kept off work until July 2007 when Dr. Brakel expected to provide an updated evaluation. (AR 267.)

1    From April to July 2007, steroid injection therapy was administered to

2    Plaintiff's lower back.  (AR 275, 283-84.)  He reported that his pain was reduced

3    from 7/10 to 6/10 on the visual analogue scale.  (AR 283-84.)  Plaintiff also tried

4    physical therapy from May to June 2007.  An October 2007 noted indicates that he

5    was discharged from further physical therapy because no further treatment was

6    "authorized per insurance or per physician.  (AR 332.)  On discharge, the physical

7    therapist noted that the Plaintiff's pain had slightly decreased, but remained at 6-

8    7/10, and stated that the goal of enabling him to return to his activities of daily living

9    were not achieved.  (*Id*.)

10    In October 2007, Dr. Sheppard noted that Plaintiff's left thumb was healing,

11    but "with very mild subluxation without significant instability" and intact tendon

12    function.  (AR 646-50.)

13    On November 2007 and January 2008, neurosurgeon Niteen Andakar, M.D.,

14    an associate of Dr. Brakel's, saw Plaintiff for a surgical consultation.  (AR 374-75.)

15    He reviewed the imaging studies from January 2007 and stated that the Plaintiff's

16    MRI showed he "does  have disk osteophyte complexes, however, these are off to the

17    left side."  On the CT scan of the lumbar spine, Dr. Andakar found "significant face

18    arthropathy at the [L5-S1] facet joints," and "some moderate stenosis . . . ."  (AR

19    374.)  A new MRI was ordered and continued "to show facet joint changes," but the

20    doctor did not see "any severe foraminal or central stenosis" at the L5-S1 level.  (AR

21    376).  The doctor suggested that the Plaintiff wean himself from the Percocet he was

22

taking, continue to pursue conservative treatment such as epidural steroid shots and acupuncture.  (AR 375-76.)

On December 13, 2007, the Plaintiff saw Edward Suarez, M.D., a state agency physician.  (AR 357-363.)  After examining the Plaintiff, Dr. Suarez concluded that he was "basically normal" with only mild cervical spine and lumbosacral spine disease.  He found that the Plaintiff's shoulder separation left him with "minimal discomfort at 160 degrees of forward elevation."  (AR 359.)  Dr. Suarez opined that Plaintiff had no limitations, except for lifting of 40-45 pounds occasionally and 35-40 pounds frequently.   (AR 359, 353-55.)  He indicated that Plaintiff "was basically normal.  He is driving.  He should be able to return to any activity that he chooses." (AR 359.)

On January 24, 2008, Plaintiff had a second surgery on his left thumb to address "loosening of his fusion site and painful retained hardware."  (AR 382-83.) On February 28, 2008, the thumb was healing well, and the pain was improved, but Plaintiff was still in a cast and restricted from doing any lifting or pushing for a month.  (AR 395.)   A month later, Plaintiff reported that he was satisfied with his progress, but that he was still experiencing pain and weakness in the thumb.  (AR 552.)   On follow-up in May, Plaintiff was satisfied with the function of his left thumb, but reported increasing symptoms in his right thumb.  Dr. Sheppard discussed ligament reconstruction and fusion and the Plaintiff indicated that he would like to proceed with surgical intervention on the right thumb.  (AR 632.)

From March to May 2008, Plaintiff underwent acupuncture treatments for his musculoskeletal pain with Chun Wah Ho, M.D. Dr. Ho reported that Plaintiff suffered from chronic lower back pain, without radiculopathy or muscle atrophy. (AR 401, 436.)

In April 2008, Charles Fina, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment and found Plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk or sit about 6 hours each in an 8-hour day; frequently balance, stoop, kneel, crouch, and crawl; frequently reach with his right arm and handle and finger with his left hand; occasionally climb ramps and stairs; but never climb ladders, ropes, or scaffolds.

On June 19, 2008, Dr. Sheppard performed right thumb surgery for post-traumatic carpometacarpal joint arthritis. (AR 482-83.) Eleven days later, the doctor reported that he was healing without complication (AR 543.), and on July 29, 2008, the doctor reported that his wound was healed, the thumb was stable, and there was "minimal pain with axial loading." (AR 628, 662.)

Dr. Brakel saw Plaintiff later in June 2008 for an updated evaluation. Dr. Brakel noted that he remained disabled "due to multiple health problems, with particular contribution from a motorcycle accident . . . in which he sustained multiple musculoskeletal, joint and spinal injuries." (AR 812.) He noted that despite intensive conservative therapies, Plaintiff continued "to experience neck pain with radiation to the right arm; Low back pain radiates to his legs—predominantly to the right." (*Id*.) Dr. Brakel conducted a neurological examination and reported:

Upper extremity strength is symmetric at 5/5 in all muscle groups; Sensation is intact in all modes in all dermatomes. Reflexes are 2+ and symmetric at biceps, triceps and brachioradialli. There is no incoordination. Fine motor movements of hands are intact and coordinated. There is no evidence of peripheral nerve impingement. Range of motion of neck is diffusely decreased; Positive Spurling's sign to the Right; right triceps reflex is blunted relative to left. Range of motion of the lumbar spine is limited in flexion secondary to induction of lumbar spasm. Ankle jerks are blunted relative to knee jerks. Positive straight leg raising on right at 70 degrees. Gait is antalgic on the right. No fasciculation or limb wasting is noted. No bowel or bladder control issues are raised.

(AR 813-14.)

On September 2, 2008, Plaintiff saw Dr. Sheppard on follow-up for his right thumb and with a complaint of right shoulder pain. Dr. Sheppard noted "what appears to be an AC separation and rotator cuff irritation," and recommended an arthrogram to determine the integrity of Plaintiff's rotator cuff. (AR 627.) The radiologist's impression included a finding "in the right acromioclavicular joint suggestive of chronic ligamentus disruption," and "[d]egenerative changes in the right glenhhumeral joint." (AR 664.) Plaintiff's right thumb was reported by the radiologist as stable in appearance. (AR 661.)

On September 3, 2008, Plaintiff saw Dr. Brakel, who reported that Plaintiff continued to suffer from neck pain syndrome, with significant degenerative disc disease and spondylosis at C5-6 and C6-7, and low back syndrome with advanced degenerative disc disease with high-grade stenosis at L4-5 and feature of right L5 radiculopathy. Dr. Brakel stated that Plaintiff "remains totally disabled from his work position and this is for the foreseeable future." (AR 688.)

1    A month later, on October 2, 2008, Dr. Brakel completed a form noting that

2 Plaintiff had lumbar and cervical stenosis and radicular pain from both.  He reported

3 Plaintiff's pain level as moderate and precluding "detailed/complex skills."  (AR

4 682.)  He opined that Plaintiff did not have the ability for "simple grasping" and

5 could not use his hands for repetitive motion.  Dr. Brakel estimated that Plaintiff

6 could never lift more than 10 pounds, could rarely lift 5-10 pounds, and could

7 occasionally lift less than 5 pounds.  He believed that the Plaintiff could sit for four

8 hours and stand for two during an eight-hour day.  (AR 683.)

9    During the same period, Dr. Ho completed a similar form and indicated that

10 Plaintiff suffered from "severe" pain associated with his lumbar and cervical spine

11 and his wrists that precluded skilled tasks, but not unskilled tasks.  Dr. Ho stated that

12 Plaintiff could lift 0-4 pounds occasionally and 5-10 pounds rarely; could sit two

13 hours a day and stand/walk one hour a day; could occasionally bend and reach above

14 shoulder level; could not squat, crawl, or climb; could not grasp, push, pull, or do

15 fine manipulation with either hand; and need to change positions during the day.  AR

16 561-63.

17    Plaintiff next saw Dr. Brakel on November 5, 2008.  His evaluation largely

18 remained the same and he noted that Plaintiff's persistent radiculopathies had not

19 responded to conservative management.  Dr. Brakel requested MRI studies to assess

20 the anatomy of Plaintiff's cervical and lumbar spines.  He also noted that he would

21 review past EMG studies.  (AR 766.)

22

On November 11, 2008, Plaintiff saw Christopher Wintzer, M.D., in relation to his claim for private long-term disability benefits. Dr. Wintzer reported that Plaintiff had a full range of motion of his arms, but grinding with right shoulder with motion, reduced range of motion and grip strength in his hands, and reduced range of motion of the back. (AR 694-96). He opined that Plaintiff could lift up to 9 pounds, sit 30 minutes for 2 hours total and could stand/walk 20 minutes for 2 hours total; occasionally bend, and never squat, crawl, climb, reach above should level, do simple grasping, pushing/pulling, or fine manipulation with his right hand, or engage in repetitive motion tasks with either hand. He indicated that Plaintiff should also avoid heights and machinery. (AR 690-91).

In a radiology report covering an arthrogram study of the right shoulder performed on November 3, 2008, it was reported that there was no evidence of "full-thickness or high-grade partial-thickness articular surface rotator cuff tear." (AR 770-71). An MRI on the same date revealed evidence of a acromioclavicular separation, evidence of adhesive capsulitis, a partial tear of the muscle and tendon, and degenerative fraying. (AR 772). Based on the studies, Dr. Sheppard recommended a course of rotator cuff strengthening and continued non-operative management. (AR 768).

Nerve studies of Plaintiff's hands on November 24, 2008, showed mild right and mild-moderate left carpal tunnel syndrome, but did not explain Plaintiff's continued complaints of right fourth and fifth digit parathesias. Polyphasia was

found in the first dorsal interosseus muscles on the right and were reported as indicating chronic distal ulnar nerve injury. (AR 817-19).

Dr. Brakel again saw Plaintiff on December 17, 2008 to review the MRI study of his cervical spine. He noted a "rather substantial degree of degenerative abnormality at C5-6 and C6-7," and disc and osteophyte protrusion, and his impression was largely unchanged. (AR 779-80). A subsequent MRI of the lumbar spine , conducted in March 2009, showed disc bulging and mild foraminal narrowing at L3-5 and degenerative disease with mild left foraminal narrowing at L5-S1. (AR 853-54).

On March 17, 2009, Plaintiff had a second surgery on his right thumb. (AR 825-26). Subsequent records show progressive consolidation of the right thumb, and after the cast was removed, Plaintiff was advised to avoid rigorous pinching, lifting, pushing, pulling, or carrying. (AR 841-43).

In June 2009, Dr. Brakel saw Plaintiff and his impressions were unchanged. He indicated that Plaintiff would be seen quarterly thereafter. (AR 847-50). In July 2009, Plaintiff was given an epidural steroid injection in the area of his lumbar spine to address his low back and right leg pain. (AR 857).

Plaintiff returned to Dr. Sheppard for follow-up after the revision of his right thumb surgery. In June 2009, he had no complaints of pain, but radiographs showed incomplete consolidation and the doctor was "fearful that if he does not progress to fusion, then iliac crest bone grafting will be necessary." (AR 861). By July,

radiographs showed progressive consolidation and Plaintiff reported gradual improvement in strength and pain symptoms. (AR 860).

## C. Hearing Testimony

### 1. Plaintiff's Testimony

Plaintiff testified that he was in a motorcycle accident on October 16, 2006. (AR 35, 38). He reported having pain in his neck that radiated into his right arm and fingers, pain in his low back that radiated down his right leg, pain in his right shoulder, and pain in both thumbs. (AR 39, 49). He reported two surgeries on his right thumb and two surgeries on his left thumb (AR 38-40), and that a third surgery on his right thumb was possible. (AR. 46). He testified that his right thumb was "weak," and that Dr. Brakel and advised him to "take it easy" with lifting and moving anything with that hand. (AR 48). He said he had received injections in his low back and that surgery was possible. (*Id*.) He reported that he could stand for only 15 to 30 minutes, walk for 15 minutes, and sit for 30 to 45 minutes. (AR 40-41).

Plaintiff reported his daily activities as including watering outdoor plants, loading the dishwasher, straightening the house, looking after his three dogs, reading the newspaper, watching television, and sometimes attending church. (AR 41-42). He had a few friends whom he sometimes visited for dinner. (*Id*.) He reported using a knife and fork to eat and that he had difficulty getting dressed so he usually wears shorts and slip-on sandals. (AR 44-45). He has problems gripping and writing and generally writes only short notes. (AR 44). He sits in his recliner for approximately

13

four hours in the daytime and intermittently lays down or walks due to the pain in his lower back, neck and right leg. (AR 49). He also has trouble concentrating and remembering information and often needs help from his fiancé. (AR 50).

### 2. Vocation Expert Testimony

The ALJ asked Vocation Expert (VE) Ruth Van Fleet whether there would be any jobs for an individual of Plaintiff's age (55) and education (high school and some college), with Plaintiff's work experience (patient technician), with the following limitations:

- lift/carry 35 pounds occasionally and 40 pounds frequently;

- occasionally bend;

- avoid work above shoulder height with the right arm;

- occasionally engage in fine or gross manipulation and fingering; and

- avoid excessive dust, fumes, or gases

(AR 55-56, 60-61). The VE testified that such an individual could not perform Plaintiff's past work, but could perform other occupations in the national economy, including home attendant companion and security guard. (AR 58). The VE noted that he could work in these occupations if his pain levels were moderate but controlled, but could not do this work if his pain levels were characterized as "severe." (AR 59).

### D. ALJ's Decision

The ALJ found that Plaintiff had the following severe impairments: cervical/lumbar spine disorder, right shoulder disorder, and status post surgeries on both thumbs. (AR 14-20.) Based on testimony from a vocational expert, the ALJ concluded that Plaintiff could not return to his past relevant work, but found that "considering the [Plaintiff's] age, education, work experience, and residual functional capacity, [he] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (AR 26.)

## III. STANDARD OF REVIEW

For purposes of Social Security benefits determinations, a disability is defined as:

> The inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. § 404.1505.

Whether a claimant is disabled is determined using a five-step evaluation process. It is claimant's burden to show (1) he has not worked since the alleged disability onset date, (2) he has a severe physical or mental impairment, and (3) the impairment meets or equals a listed impairment or (4) his residual functional capacity ("RFC") precludes him from doing his past work. If at any step the Commission determines that a claimant is or is not disabled, the inquiry ends. If the claimant satisfies his burden though step four, the burden shifts to the Commissioner to show

at step five that the claimant has the RFC to perform other work that exists in substantial numbers in the national economy. *See* 20 C.F.R. § 404.1520(a)(4)(i)-(v).

In this case, Plaintiff was denied at step five of the evaluation process. The step five determination is made on the basis of four factors: the claimant's RFC, age, education, and work experience. *Hoopai v. Astrue*, 499 F.3d 1071, 1074 (9th Cir.2007). The Commissioner can meet his burden at Step Five "through the testimony of a vocational expert or by reference to the Medical Vocation Guidelines." *Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir.2002); 20 C.F.R. pt. 404, subpt. P, app.2 (the "grids").

The ALJ's decision to deny disability benefits will be vacated "only if it is not supported by substantial evidence or is based on legal error." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir.2006). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance, i.e., such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir.1997). In evaluating whether the decision is supported by substantial evidence, the Court must consider the record as a whole, weighing both the evidence that supports the decision and the evidence that detracts from it. *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir.1998); *see* 42 U.S.C. § 405(g) ("findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"). If there is sufficient evidence to support the Commissioner's determination, the Court cannot

substitute its own determination. *See Young v. Sullivan*, 911 F.2d 180, 184 (9th Cir.1990).

## III.    DISCUSSION

Plaintiff argues that the Commissioner's denial of benefits is not supported by substantial evidence. *Plaintiff's Opening Brief* (Doc. 19), pp. 12-16. He contends that the ALJ failed to accord the proper weight to the testimony of his treating physicians and failed to properly apply the excess symptom analysis. *Id.* The Commissioner responds that the ALJ properly considered and evaluated the medical source opinions and Plaintiff's credibility, and that the decision is supported by substantial evidence. *Defendant's Memorandum in Opposition to Opening Brief* (Doc. 20), pp. 13-23.

### A.    Evaluation of medical opinions

"The ALJ must consider all medical opinion evidence." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cri.2008); *see* 20 C.F.R. § 404.1527(d); SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996). "[T]he ALJ may only reject a treating or examining physician's uncontradicted medical opinion based on 'clear and convincing' reasons." *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1164 (9th Cir.2008) (citing *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir.1995)). Where a treating physician's opinion is contradicted, it may be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. *Carmickle*, 533 F.3d at 1164 (citing *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983)). "The ALJ Can 'meet this burden by setting out a detailed and thorough

summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir.2002). "The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record." *Id*.

In the decision, the ALJ extensively relies on Dr. Suarez's opinions to discount the opinions of all of the treating physicians generally, and those of Dr. Brakel specifically, by characterizing Dr. Suarez's opinion as "generally consistent with the medical evidence." (AR 22-24.) To properly rely on Dr. Suarez's opinions as a non-treating physician, the ALJ was obligated to illustrate how those opinions were consistent with independent clinical findings or other evidence in the record. *Thomas*, 278 F.3d at 957. However, rather than explain how Dr. Suarez's opinions were supported by other evidence in the record, the ALJ merely conclusively states that Dr. Suarez's opinion would be given "substantial persuasive weight" because it "is generally consistent with the medical evidence." (AR 24.) An examination of his opinions, however, indicates that Dr. Suarez's opinion was riddled with oversight and unexplained inconsistencies.

Dr. Suarez's opinion was that Plaintiff's "only limitation will be lifting over 40 to 45 pounds occasionally, 35 to 40 pounds frequently, and was basically normal," and "should be able to return to any activity that his [sic] chooses." (AR 359.) In reaching this conclusion, Dr. Suarez completed a medical source statement wherein he indicated that Plaintiff could frequently climb, stoop, kneel, crouch, crawl, reach,

18

handle, finger and feel.  (AR 354.)  Despite the fact that much, if not all, of these conclusions are unsupported by anything the Court can locate in the record, Dr. Suarez offered nothing in the section of the statement that is provided for that purpose.  (*See* AR 354.)

Specifically, Dr. Suarez says nothing about Dr. Brakel's consistent opinion that Plaintiff was disabled due to his ongoing issues with his spinal disorders.  (*See* AR 274.)  He fails to recognize that Dr. Brakel, relying on MRI and CT studies, found foraminal narrowing, a disc bulge, and nerve impingement in the lumbar spine, and foraminal narrowing and disc osteophyte complex in the cervical spine, and that Plaintiff was experiencing neck and low back pain with radiation down the thigh.  (AR 267, 268.)  Dr. Suarez also ignores that Plaintiff had steroid injections and physical therapy to deal with his pain.  (AR 275, 332.)  In short, Dr. Suarez's finding that Plaintiff was "basically normal," and could frequently crouch, crawl, stoop and kneel, is entirely inconsistent with the determination by Dr. Brakel's, who was relying largely on clinical evidence, that Plaintiff was suffering from advanced degenerative cervical disc disease, and potential nerve impingement and significant facet arthropathy in the lumbar spine.   (AR 268, 260-61.)  Dr. Brakel specifically limited Plaintiff to lifting no more than ten pounds, and determined that he was unable to sit for more than 20 minutes at a time, stand for five minutes, and walk for ten.  (AR 260-61.)  He specifically stated that Plaintiff should not bend, stoop, crouch, crawl, or kneel.  (*Id*.)

Given that the opinions of Drs. Brakel and Suarez were at odds, the ALJ was required to offer a detailed and thorough summary of specific reasons supported by substantial evidence before rejecting the opinion of Dr. Brakel. *See Carmickle*, 533 F.3d at 1164. Because the ALJ did not identify the facts and clinical evidence that might support Dr. Suarez's wholesale rejection of Dr. Brakel's opinion, *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir.2002), the Court rejects the ALJ's conclusion and recommends that the District Court reject the ALJ's conclusion.

## B.    Evaluation of Plaintiff's Testimony

Plaintiff also challenges the ALJ's conclusion that his allegations regarding the severity of his pain symptoms were exaggerated and contends that the ALJ failed to make specific findings justifying the decision. *Opening Brief*, p. 14. In making the credibility determination, the ALJ engages in a two-step analysis. *Vasquez v. Astrue*, 572F.3d 586, 591 (9th Cir. 2009). First, the ALJ must evaluate whether there is "'objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id*. (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)). If such evidence is found, the ALJ must provide "specific, clear and convincing reasons" in order to reject the claimant's testimony regarding pain severity. *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1234 (9th Cir.2011). In evaluating the claimant's testimony, "[t]he ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the

symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (citations and internal quotation marks omitted).

Here, the ALJ found that Plaintiff did suffer from "underlying medically determinable impairments that could possibly produce some pain or other symptoms." (AR 22.) However, the ALJ doubted the claimed severity of Plaintiff's pain because Plaintiff testified that he cared for pets, did some household chores, watered outdoor plants, watched television, went for walks, drove a car, went to church and visited with friends and relatives. (*Id*.) Of course, the ALJ can rely on can consider the inconsistency between a claimed disability and the claimant's ability to engage in daily activities. *Lingenfelter*, 504 F.3d at 1040. However, a claimant need not "vegetate in a dark room" in order to be eligible for benefits. *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987) (internal citations and quotes omitted).

Turning to the transcript, what little testimony the ALJ obtained about the specifics of Plaintiff's activities suggests that he does very little. While the ALJ noted that Plaintiff cared for pets, he did this by sitting outside and watching them while drinking coffee. (AR 42.) He would go visit people or go to church "sometimes" and "not on a regular basis." (AR 41-42.) After emphasizing these less than demanding tasks, the ALJ entirely ignores Plaintiff's testimony that his

21

girlfriend helps him dress and he wears shorts and sandals to make dressing easier. (AR 44-45.) He has trouble with zippers and buttons. (AR 45.) He sits in a recliner for approximately four hours during the day, but has to lay down or get up and walk due to pain in his lower back, neck, and right leg. (AR 49.)

When considering Plaintiff's activities, the ALJ ignored many of his inabilities and exaggerated the extent of his abilities. More important, however, is that he described Plaintiff to the VE as having slight pain that was entirely controlled by medication. (AR 55-56.) The record does not support that characterization. No mention was made as to how such activities as watching dogs and television indicate capacities that are transferable to a work setting. *See Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999). A fair reading of Plaintiff's abilities and limitations would lead a reasonable person to conclude that his pain symptoms were not exaggerated and that the nature of his activities were not such that his credibility was undermined.

### 3.    Remedy

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order an immediate award of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Ordinarily, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional proceedings. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004). Generally, an award of benefits is appropriate only when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before the determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d at 1292. An award of benefits is appropriate where no useful purpose would be served by further administrative proceedings, or where the record has been fully developed. *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1399 (9th Cir. 1988). The Ninth Circuit has explained that "where the ALJ improperly rejects the claimant's testimony regarding his limitations, and the claimant would be disabled if his testimony were credited," the testimony could be credited as true, and an award of benefits directed. *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003).

Here, the ALJ improperly rejected the opinion of Plaintiff's treating physician, Dr. Brakel, by failing to offer specific reasons supported by substantial evidence before rejecting the opinion. The ALJ also improperly rejected Plaintiff's pain testimony due to his purported ability to perform activities inconsistent with his alleged symptoms. It is clear that, viewing the record as a whole and crediting Dr. Brakel's opinion and Plaintiff's testimony, Plaintiff would be found disabled.

Additionally, the Ninth Circuit has also emphasized that "[a]llowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication," and unfairly "delay much needed income for claimants who are unable to work and are entitled to benefits."

*Benecke v. Barnhart*, 379 F.3d 587, 594 (9th Cir. 2004). Thus, the Court will recommend that the District Court remand this matter for an award of benefits.

**IV.    RECOMMENDATION**

For the foregoing reasons, the Magistrate Judge **recommends** the District Court, after its independent review, enter an order remanding the case to the ALJ for an award of benefits.

Pursuant to Federal Rule of Civil Procedure 72(b)(2), any party may serve and file written objections within 14 days of being served with a copy of this Report and Recommendation. If objections are not timely filed, they may be deemed waived. The parties are advised that any objections filed are to be identified with the following case number: **CV-10-544-TUC-FRZ.**

Dated this 8th day of January, 2013.

Jacqueline M. Rateau
United States Magistrate Judge